# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00315-CV

**Crystal Spurck, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT
NO. 17,416, HONORABLE JOE CARROLL, JUDGE PRESIDING**

## O P I N I O N

Crystal Spurck appeals from the trial court's order terminating her parental rights to her minor child, L.G., after the jury found that her rights should be terminated. On appeal, Spurck argues that: (1) the trial court erred in failing to exclude the testimony of two witnesses because the Department failed to identify the witnesses during discovery; (2) the court erred in failing to strike L.G.'s foster parents' petition to intervene based on lack of standing; (3) the court erred in failing to submit a jury charge stating the statutory preference for placement with a family member; (4) the evidence is legally and factually insufficient to show that the statutory grounds for termination exist; and (5) the evidence is legally and factually insufficient to show that termination is in L.G.'s best interest. We affirm the judgment of the trial court.

**BACKGROUND**

In May of 2007, Spurck began dating Lowell Garza when she was sixteen years old.[1] Spurck moved in with Garza's parents a month later, at which time she learned that she was pregnant. Spurck gave birth to her son, L.G., in February of 2008.[2] At that time Garza was in jail for probation violations. Garza was released in May of 2008, and he and Spurck married that July. Two months after their marriage, Garza was again incarcerated for drug related charges and sent to a drug rehabilitation facility for six months. Garza returned from the rehabilitation facility in April of 2009, and a month later Spurck gave birth to Garza's daughter, I.G.

On August 17, 2009, ten-week-old I.G. died while at home with Garza, Spurck, and L.G. An autopsy revealed that I.G. died from a fractured skull and blunt force trauma caused by the pounding of a fist on her abdomen.

**Criminal investigation into I.G.'s death**

Texas Department of Public Safety Ranger Jesus Ramos conducted the investigation into I.G.'s death. First, Ranger Ramos interviewed Garza, who stated that he and Spurck left I.G. on the bed while they went outside to smoke a cigarette, and when they returned, I.G. was lifeless. They drove I.G. to the emergency room, where she was pronounced dead. Garza offered no explanation as to what caused I.G.'s death. Ranger Ramos then attended I.G.'s autopsy, where he learned the cause of I.G.'s death and about indications of prior abuse.

---

[1] The facts recited herein are taken from testimony and exhibits admitted at trial.

[2] Spurck assumed that Garza was L.G.'s father, though subsequent genetic testing revealed that Jeffrey Cochran is L.G.'s biological father.

2

Ranger Ramos then interviewed Spurck about I.G.'s injuries. Ranger Ramos noted that Spurck was uncooperative and "very defensive, very emotional, when [he] started asking questions about . . . Garza and his temper and her relationship." Ranger Ramos told Spurck about the results of the autopsy and stated "somebody murdered your baby and you and your husband had something to do with it." Spurck denied the accusation, walked out of the interview, found Garza in the lobby of the Lampasas County Sheriff's Office, and told Garza "don't tell them anything." Ranger Ramos interviewed Garza a second time, but Garza refused to cooperate. Ranger Ramos secured arrest warrants for Garza and Spurck on the charge of injury to a child.

After arresting Garza and Spurck, Ranger Ramos conducted his second interview of Spurck. At this interview, Spurck discussed Garza's temper and his drug and alcohol abuse. Ranger Ramos subsequently testified that Spurck said, "I know I should be in so much trouble for bringing that monster home." Ranger Ramos testified that Spurck admitted to knowing about Garza's conviction for injury to a child in 2008, though Spurck believed Garza was innocent of that charge. In addition, Spurck told Ranger Ramos that Garza choked her while she was pregnant with L.G.

When questioned about the night of I.G.'s death, Spurck said that I.G. was crying and that she offered to watch her, but Garza stated that "he would calm [I.G.] down." Spurck proceeded to take a shower, and when she returned, she found I.G. lifeless. Spurck and Garza decided not to call for an ambulance because they were afraid that authorities would believe Garza injured I.G.

After concluding his second interview of Spurck, Ranger Ramos questioned Garza a third time. Initially, Garza speculated that I.G.'s injuries may have been caused by Garza pushing up on her legs in an attempt to burp her. However, after Garza spoke with his father, he confessed

3

to hitting I.G. at least three times, but denied fracturing I.G.'s skull. Ranger Ramos told Spurck that Garza had confessed to hitting I.G., and Spurck then told Ramos that she believed Garza was responsible for I.G.'s skull fracture. Ranger Ramos noted that during this final interview, Spurck grabbed and squeezed his leg while telling him that she had nothing to do with I.G.'s injuries. Ranger Ramos believed that this was an attempt to distract or manipulate him, and he pushed her hand away. Ranger Ramos recommended that Garza be charged with murder and Spurck be charged "at the very least . . . with endangerment to a child" because she knew her children were being hurt and "she fail[ed] to secure their safety." The criminal charges against Spurck were subsequently dropped for an unspecified reason.

**Removal of L.G. and underlying proceedings**

The Department was notified of I.G.'s death and the results of Ranger Ramos's investigation. On August 19, 2009, the Department filed its original petition for protection of then eighteen-month old L.G., for conservatorship of L.G., and for termination of Garza's and Spurck's parental rights to L.G. The trial court issued an order of protection naming the Department as L.G.'s temporary sole managing conservator and appointing a guardian ad litem and attorney ad litem for L.G. *See* Tex. Fam. Code Ann. §§ 107.001(2), (5) (defining attorney ad litem and guardian ad litem), 153.371 (discussing rights of sole managing conservator) (West 2008).

The Department placed L.G. in a foster home. That same day, L.G.'s original foster parents took him to the emergency room because L.G. had a diaper rash, scars and abrasions on his body, and was exhibiting troubling behavior. The foster parents noted that L.G. was cursing, hitting dolls in the abdomen, and then placing his finger over the doll's mouth and saying "shhhh." L.G.

4

was examined for signs of potential abuse. The treating physician noted that there was no evidence of "recent serious injuries," but the old scars and bruises "could well be consistent with nonaccidental [sic] trauma particularly considering the history of the fatal nonaccidental trauma in his sibling." However, the physician was ultimately unable to determine whether L.G.'s injuries were accidental or the result of intentional abuse. L.G. was then transferred to a second foster home, where he still remains.

Initially, the Department's permanency plan for L.G. was to reunify him with Spurck. Following the court-ordered removal, the Department created a family service plan through which Spurck could work toward regaining custody of L.G. *See id.* § 263.106 (West 2008). The plan required, among other things, that Spurck complete a psychological evaluation, attend individual counseling sessions, complete parenting classes, follow the recommendations of her psychologist and therapist, maintain housing that is appropriate for L.G., take responsibility for her part in L.G.'s abuse, and make changes to alleviate possible future abuse.

Spurck participated and completed the required activities, but her counselor noted that she sensed a "disingenuous affect" from Spurck throughout their sessions. The counselor also expressed concerns that Spurck was not ready to resume guardianship of L.G. because she was still "working through" the past sexual abuse she suffered when she was a minor and the domestic abuse she suffered with Garza. Similarly, her counselor diagnosed Spurck as having "Mood disorder, Generalized Anxiety Disorder, Partner Relational Problem . . . Antisocial Personality Trait, Dependent Personality Trait, [and] Narcissistic Personality Trait."

5

Subsequently, the Department found a report that discussed the physical examination that L.G. received when he was initially placed with foster parents.[3] The report discussed the physician's examination of L.G.'s injuries as outlined above and the physician's conclusion that he was unable to determine whether the injuries were the result of an accident or abuse. This report raised additional concerns about reunifying Spurck with L.G. Ultimately, the Department changed its permanency plan for L.G. to "unrelated adoption," seeking to terminate Spurck's parental rights so that L.G. could be adopted by his current foster parents.

**The trial**

In November of 2010, the trial court commenced a final hearing on the Department's petition to terminate Spurck's and Jeffrey Cochran's parental rights. *See supra* n.2. Spurck's grandmother and L.G.'s foster parents intervened in the case. *See* Tex. Fam. Code Ann. § 102.004(b) (West 2008) (noting that court may grant child's grandparent or "other person deemed . . . to have had substantial past contact with the child" leave to intervene in pending suit). The trial court issued a written report containing its findings of fact, conclusions of law, and recommendations. The report recommended that both parents' parental rights to L.G. should be terminated.[4] Spurck's grandmother timely filed a request for de novo hearing before the referring court so that a jury could determine whether Spurck's rights should be terminated. *See id.* § 201.015 (West Supp. 2012) (describing procedure for requesting de novo final hearing).

---

[3] Testimony indicates that this report was initially misfiled, but later rediscovered.

[4] Cochran did not appeal the trial court's determination, and the termination of his parental rights is not before us.

6

A de novo hearing before the jury began on February 22, 2011. This trial lasted five days and included the testimony of over twenty witnesses. The Department called Ranger Ramos to testify about his investigation of I.G.'s death as outlined above. Spurck objected to Ranger Ramos's testimony based on the Department's failure to timely designate him as a witness, which was overruled by the trial court. *See* Tex. R. Civ. P. 193.6(a) (excluding evidence that was not timely disclosed unless certain exceptions are met). Next, the Department called L.G.'s treating physician, who testified about L.G.'s injuries and his conclusion that he was not able to determine whether the injuries were the result of abuse or an accident.

The Department then called the conservatorship worker in L.G.'s case to discuss the Department's investigation and recommendation. The conservatorship worker testified that Spurck was motivated, that she actively participated in therapy, was seeking employment, and improved her parenting skills over the course of the visitations. However, she also testified that Spurck admitted to having trouble applying the skills she learned in her parenting classes to her interactions with L.G. The Department also called Spurck's counselor, who testified that Spurck participated well in their sessions and that she ultimately recommended that Spurck be reunified with L.G.

Finally, the Department called Spurck as a witness. Spurck testified that on the night of I.G.'s death, she took a twenty-five minute shower while Garza was caring for I.G. When she left the shower, Spurck noticed that I.G. was not breathing normally, but she suspected it might have been the result of congestion. Spurck then went outside to talk to Garza, who told her that I.G. had just gone to sleep. When she came back inside, Spurck "knew something was wrong" because I.G. was "clammy with no signs of blood on her face or lips." She stated that she did not call for an

7

ambulance because she was afraid that I.G. would have been transferred amongst hospitals, but she admitted that she was also concerned that the police might arrest Garza if she called 9-1-1.

Spurck also discussed her domestic abuse at Garza's hands. She admitted that L.G. witnessed Garza assaulting her two or three times. She also admitted that she had heard Garza had previously injured a child, that he was on probation "for something," but she claimed she never really knew Garza's criminal history. She stated that she did everything she could to comply with the family service plan, and that she had learned a lot from her counseling and parenting classes. Spurck professed her love for L.G. and stated that she was ready to provide her son with a loving and caring environment.

Subsequently, the Department called Sergeant Charles Boswell with the Lampasas Police Department as a rebuttal witness. Sergeant Boswell testified that before I.G.'s death, he informed Spurck that Garza had been previously arrested for injury to a child. Spurck objected to the admission of Sergeant Boswell's testimony, claiming that his testimony did not actually contradict Spurck's statements and that his testimony constituted unfair surprise. *See id.* § 193.6(a). The trial court overruled Spurck's objections.

After the Department concluded its case in chief, Spurck, her grandmother, and L.G.'s foster parents each called several witnesses to testify about who should be allowed to have custody of L.G. These thirteen witnesses, most of whom were family members or friends of the various parties, provided ample testimony about each party's ability to take care of L.G. After the conclusion of evidence, the jury found by clear and convincing evidence that Spurck's parental rights to L.G. should be terminated and that L.G.'s foster parents should be appointed as his

8

managing conservators. The trial court entered a judgment consistent with the jury's findings. This appeal followed.

**DISCUSSION**

**Exclusion of witnesses not identified in discovery**

In her first issue on appeal, Spurck asserts that the trial court erred in admitting the testimony of Ranger Ramos and Sergeant Boswell. Specifically, Spurck argues that because the Department failed to respond to her discovery request for the names and contact information of its witnesses, the trial court should have excluded the officers' testimony. *See* Tex. R. Civ. P. 193.6(a) (noting testimony generally excluded if party fails to timely identify witness in discovery response). We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A court abuses its discretion if it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Drilex Sys., Inc. v. Flores*, 1 S.W.3d 112, 119–20 (Tex. 1999) (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

Under the rules of civil procedure, when a party has not timely made, amended, or supplemented a discovery response, the party "may not . . . offer the testimony of a witness (other than a named party) who was not timely identified" unless the court finds that: (1) the party had good cause for failing to timely identify the witness, or (2) the failure to timely identify the witness will not unfairly surprise or unfairly prejudice the other parties. Tex. R. Civ. P. 193.6(a).

9

A disclosure is presumed to be untimely if it was made less than thirty days before trial. *Id.* 193.5(b). The party seeking to introduce the evidence has the burden of establishing in the record either good cause for the untimely disclosure or the lack of unfair surprise and prejudice. *Id.* 193.6(b). It is within the trial court's discretion to determine whether the party has met this burden. *See Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992); *Allan v. Nersesova*, 307 S.W.3d 564, 575 (Tex. App.—Dallas 2010, no pet.).

In this case, Spurck served a written request for disclosure that sought the identities of the Department's potential witnesses. *See* Tex. R. Civ. P. 192.3(d), 194.2(e). Spurck also filed a separate motion to compel discovery from L.G.'s foster parents, which the trial court denied. The Department did not respond to Spurck's discovery request, apparently believing that the trial court denied all of Spurck's discovery requests when it denied Spurck's motion to compel discovery from the foster parents.[5] At trial, when the Department attempted to call Ranger Ramos and Sergeant Boswell to testify, Spurck objected, claiming that the testimony was inadmissable because the Department failed to respond to her discovery request. *See id.* 193.6(a). In response, the Department initially claimed that the trial court had already denied Spurck's discovery request in its previous order. However, when it realized that it misunderstood the court's previous ruling, the Department argued that the testimony should not be excluded because Spurck was not unfairly surprised by Ranger Ramos's testimony and the Department had good cause for its untimely disclosure

---

[5] The trial court's order denying Spurck's motion to compel is not included in the record before us, and thus it is unclear whether the order encompassed Spurck's discovery request from the Department. For purposes of this appeal, we assume that the court's order applied only to Spurck's motion to compel discovery from L.G.'s foster parents, and that Spurck's discovery request that related to the Department was not ruled upon.

10

of Sergeant Boswell. *See id.* 193.6(a)(1)–(2). The trial court overruled Spurck's objections and allowed Ranger Ramos and Sergeant Boswell to testify. We will review the admissibility of each witness's testimony separately.

*Testimony of Ranger Ramos*

Although there are conflicting accounts in the record of when and how Spurck's counsel learned Ranger Ramos would be testifying, there is no question she had knowledge that he would testify on the Department's behalf. The Department asserted that Spurck's counsel was aware that Ranger Ramos would be testifying for several months, even though the Department may not have notified Spurck in writing. Counsel for the Department stated that he was "pretty certain that [he has] been clear on who our witnesses are expected to be since the very first pretrial when [he] appeared in this case." Furthermore, the Department noted that Spurck's attorney had been in contact with Ranger Ramos in the weeks leading up to trial. During voir dire examination, Ranger Ramos testified that he had spoken to Spurck's counsel three weeks prior to trial and that he provided her with transcripts of his interviews with Spurck and Garza and a copy of I.G.'s autopsy report. Ranger Ramos stated that during this exchange, Spurck's counsel asked him if he would be testifying, and he responded that he assumed he would be. Spurck's counsel did not ask Ranger Ramos about what his testimony might be, and told him that she would try to have Ranger Ramos's testimony excluded.

Thus, there is evidence that the trial court could have relied upon to conclude that Spurck's counsel was not unfairly surprised or prejudiced by Ranger Ramos's testimony and that she had ample opportunity to question him about the substance of his testimony and the scope of his

11

knowledge of the facts in this case. *See id.* 193.6(a)(2); *see also Brunelle v. TXVT Ltd. P'ship*, 198 S.W.3d 476, 479 (Tex. App.—Dallas 2006, no pet.) (concluding that party not unfairly surprised when had previous contact with witness and knew witness had knowledge of relevant events). However, there is no indication in the record that Ranger Ramos testified in any prior proceedings.

We note that, in a traditional civil context, this record might present a close call about whether the Department carried its burden of establishing lack of unfair surprise. "However, in determining issues regarding the conservatorship of, possession of, and access to a child, the court's primary consideration is always the best interest of the child. Compared to the best interest of the child, technical rules of pleading and practice are of little importance . . . ." *In re P.M.B.*, 2 S.W.3d 618, 624 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (internal citations omitted) (superseded on other grounds); *see also Taylor v. Taylor*, 254 S.W.3d 527, 534 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting best interest of child may be factor in trial court's ruling on discovery sanctions). We have recognized that, with regard to the best interest of the child, "[i]t is in the court's primary interest to have as much evidence before it as possible." *R.H. v. Texas Dep't of Family & Protective Servs.*, No. 03-00-00018-CV, 2001 WL 491119, at *8 (Tex. App.—Austin May 10, 2001, pet. denied) (mem. op.) (concluding trial court erred in excluding appellant's grandparents' testimony "[r]egardless of whether the Department suffered unfair surprise or whether appellant had good cause for" failing to respond to Department's request for discovery).

In this case, Ranger Ramos's testimony addressed his investigation into I.G.'s death and Spurck's initial failure to cooperate with law enforcement. Given that I.G.'s death and Spurck's initial behavior were probative of her suitability as a parent, the trial court could have reasonably

12

concluded that the jury should be allowed to consider Ranger Ramos's testimony regardless of whether the Department failed to timely identify him as a witness. *See In re P.M.B.*, 2 S.W.3d at 624; *see also Drilex Sys., Inc.*, 1 S.W.3d at 119–20 (noting that trial court's evidentiary ruling should be upheld if supported by any basis in the record). Therefore, we cannot say that the trial court abused its discretion in admitting Ranger Ramos's testimony. *See Brunelle*, 198 S.W.3d at 479.

*Testimony of Sergeant Boswell*

In her testimony, Spurck stated that prior to I.G.'s death, Spurck was unaware that Garza faced criminal charges for injury to a child. The Department offered Sergeant Boswell's testimony to impeach Spurck's prior testimony and to establish that Spurck was aware that Garza had been charged with injury to a child. Sergeant Boswell testified that in 2008, while detaining Garza and Spurck for narcotics possession, he told Spurck that Garza had been arrested for injury to a child and that "she probably needed to reevaluate her relationship with Mr. Garza."

Spurck objected to Sergeant Boswell's testimony based on untimely disclosure. *See* Tex. R. Civ. P. 193.6(a). In response, the Department stated that it had only learned about Sergeant Boswell's conversation with Spurck the day before he was called as a witness. Furthermore, the Department stated that it promptly informed Spurck's counsel of Sergeant Boswell's likely testimony, and Spurck's counsel admitted that she spoke with Sergeant Boswell before he testified. The trial court overruled Spurck's objection and admitted Sergeant Boswell's testimony for the limited purpose of rebutting Spurck's assertion that she did not know that Garza had been previously arrested for injuring a child. The court noted that the Department "did not know of and would not have known of" Sergeant Boswell's conversation with Spurck prior to trial, and thus "they could

13

not [have provided] any prior notice." We take the trial court's decision to allow Sergeant Boswell to testify as an implicit finding that the Department demonstrated good cause for its failure to identify Sergeant Boswell as a witness. *See Brunelle*, 198 S.W.3d at 479 ("By overruling appellant's objection and permitting [the witness] to testify, the trial court determined implicitly either that appellees disclosed [the witness's] identity, there was good cause for not disclosing him, or that appellant was not unfairly surprised or prejudiced.").

A party cannot reasonably be expected to disclose the identity of a witness when the party is unaware of the witness's existence. Thus, when a party learns about the existence of witness during trial, the party may have good cause for failing to disclose the witness's identity to opposing counsel. *See* Tex. R. Civ. P. 193.6(a)(1); *see also Munoz v. Missouri Pac. R.R. Co.*, 823 S.W.2d 766, 769 (Tex. App.—Corpus Christi 1992, no writ) (concluding trial court did not abuse discretion in finding party demonstrated good cause for failing to identify witnesses whose existence the party did not learn about until trial). This is not a per se rule. If, for example, the party offering a witness would have learned about the witness's existence earlier if the party had conducted a reasonable investigation, the witness could be excluded based on lack of good cause. *See Alvarado*, 830 S.W.2d at 914 ("The trial court has discretion to determine whether the offering party has met his burden of showing good cause to admit the testimony" of untimely identified witness.).

In this case, however, the trial court implicitly found that the Department had demonstrated good cause for failing to identify Sergeant Spurck as a witness prior to trial. As the court correctly noted, there is nothing in the record to indicate that the Department should have or could have known about Spurck's unrecorded conversation with a police officer in Lampasas that

14

occurred more than two years prior to trial. The Department stated that it learned about Spurck's previous conversation with Sergeant Boswell when it received a letter from a police officer who was not involved in this case. According to the Department, the letter explained that Boswell told the police officer about his previous encounter with Spurck during a "general conversation" about work. If this is true, it is unlikely that the Department could have learned of Sergeant Boswell's brief interaction with Spurck that occurred over two years prior to trial, and thus the late discovery of Sergeant Boswell was purely happenstance. The trial court implicitly believed this explanation, and thus found that the Department had shown good cause for its failure to identify Sergeant Boswell. *See Munoz*, 823 S.W.2d at 769.

Furthermore, the trial court could have reasonably believed that allowing Sergeant Boswell to testify was in L.G.'s best interest. *See In re P.M.B.*, 2 S.W.3d at 624. Whether Spurck knew about Garza's alleged history of child abuse and chose to remain with him is probative of her willingness to protect her children. Furthermore, if the jury believed Sergeant Boswell's statement that he directly told Spurck that Garza faced criminal charges for injuring a child, that would indicate that Spurck lied under oath when she said she "had no knowledge that [Garza] was going to court for injury to a child charge criminally [sic]." Given that, in a termination proceeding, formal concerns about the rules of discovery are less important than providing the jury as much relevant information as possible, the trial court could have reasonably concluded that admitting Sergeant Boswell's testimony was in L.G.'s best interest. *See R.H.*, 2001 WL 491119, at *8.

Therefore, based on the record before us, we cannot conclude that the trial court abused its discretion in admitting Sergeant Boswell's testimony. Having already concluded that the

15

trial court did not abuse its discretion in admitting Ranger Ramos's testimony, we overrule Spurck's first issue on appeal.

**Intervention of L.G.'s foster parents**

In her second issue on appeal, Spurck asserts that the trial court erred in denying her motion to strike L.G.'s foster parents' petition in intervention. Specifically, Spurck argues that the foster parents lack standing to intervene under section 102.004(b) of the family code because this suit was not brought under section 102.004(a).

We review a trial court's ruling on a motion to strike for an abuse of discretion. *See In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.). However, to the extent the trial court's ruling depends on an issue of statutory interpretation, we review the court's ruling de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). "In construing a statute, our objective is to determine and give effect to the Legislature's intent." *See Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (citations and internal quotations omitted). While we first look to the plain language of the statute, we may consider other factors in ascertaining legislative intent, including the law's objective, its history, and the "common law or former statutory provisions" concerning the same or similar subjects. Tex. Gov't Code Ann. § 311.023(1), (3)–(4) (West 2005).

Generally, an intervenor must have standing to maintain an original suit in order to intervene. *Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.). A party's standing to file an original suit affecting a parent-child relationship is governed

16

by sections 102.003 and 102.004(a) of the family code.**6** *See* Tex. Fam. Code Ann. §§ 102.003 (West Supp. 2011) (providing general standing to file original suit), 102.004(a) (providing additional standing for grandparent or close relative to file original suit for managing conservatorship). However, section 102.004(b) of the family code provides a "relaxed standing rule" by which parties who would not have standing to file an original suit for managing conservatorship may nonetheless intervene in an ongoing suit. *See Whitworth*, 222 S.W.3d at 621 (noting that section 102.004(b) "applies to interventions seeking managing conservatorships as well as those seeking possessory conservatorships."). Under section 102.004(b), the trial court may, within its discretion, grant a child's grandparent or "other person whom the trial court finds to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter . . . ." Tex. Fam. Code Ann. § 102.004(b).

On appeal, Spurck notes that the Department initiated this suit based on its standing under section 102.003(a)(6). Therefore, according to Spurck, section 102.004(b) does not apply because this is not a suit "filed by a person authorized to do so *under this subchapter*." *See id.* (emphasis added). Spurck asserts that "this subchapter" refers only to section 102.004. Thus, she claims, section 102.004(b) provides a relaxed standing to intervene in suits for managing conservatorship brought only under section 102.004(a).

---

**6** The Department concedes that the foster parents lack standing under section 102.003 because L.G. had lived in their house for only nine months at the time of their intervention. *See* Tex. Fam. Code Ann. § 102.003(a)(12) (West Supp. 2012) (allowing foster parents to file original suit if child lived in their home for at least twelve months). Therefore, the foster parents have standing to intervene, if at all, under section 102.004(b). *See id.* § 102.004(b) (West 2006).

Under Spurck's interpretation, section 102.004(b) would give a grandparent or person who had substantial past contact with a child standing to intervene only in a suit for managing conservatorship brought by the child's blood relative. *See id.* § 102.004(a)–(b). Spurck does not cite—and we have not found—any authority to support this proposition. Furthermore, Spurck's interpretation is inconsistent with the unanimous precedent from this Court and our sister courts of appeals, which have applied section 102.004(b) to suits initiated by the Department. *See, e.g.*, *Jasek v. Texas Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 529 (Tex. App.—Austin 2011, no pet.) (recognizing that persons with past substantial contact could intervene under section 102.004(b) in Department's pending suit); *In re N.L.G.*, 238 S.W.3d at 830 (concluding foster parents had standing to intervene under 102.004(b) in suit originally filed by Department); *In re A.M.*, 60 S.W.3d 166, 169 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

Spurck's novel interpretation of the statute is also inconsistent with legislative intent. By adopting section 102.004(b), the legislature intended to allow individuals who could not file an original suit affecting parental rights to be able to intervene in an ongoing suit because "intervention may enhance the trial court's ability to adjudicate the cause in the best interest of the child." *In re N.L.G.*, 238 S.W.3d at 830. In this case, it would be inconsistent with the legislature's intent to permit parties to intervene in suits brought only by a child's blood relatives, while excluding them from intervening in suits brought by the Department, adoptive parents, or any other person who has standing to bring an original suit. *See id.*; *see also* Tex. Fam. Code Ann. § 102.003(a) (listing persons who have general standing to file suit).

Furthermore, Spurck's interpretation is inconsistent with the legislature's intent when it recodified the family code in 1995. *See Jones v. Fowler*, 969 S.W.2d 429, 431–32 (Tex. 1998).

18

As the supreme court explained, the recodification of the family code was not intended to make substantive changes unless the substantive change was specified in a "'Section by Section Analysis.'" *Id.* (citing House Comm. on Juvenile Justice & Family Issues, Bill Analysis, Tex. C.S.H.B. 433, 74th Leg., R.S. (1995)). In this case, prior to recodification, the predecessor to section 102.004(b) allowed parties to intervene in suits that were brought under the general standing provision.[7] *See* Act of May 23, 1987, 70th Leg., R.S., ch. 744, § 1, 1987 Tex. Gen. Laws 2666 (amended 1989) (current version at Tex. Fam. Code Ann. §§ 102.003–.004). After recodification, the general standing provision and "Standing for Grandparents or Other Persons" provisions were separated into subsections 102.003 and 102.004, respectively. *Id.*

However, there is nothing in the "Section by Section Analysis" of the recodification which indicates that the legislature intended this division of a single section into two separate subsections to create new restrictions on who could intervene in an ongoing suit. *See* House Comm. on Juvenile Justice & Family Issues, Bill Analysis, Tex. C.S.H.B. 433, 74th Leg., R.S. 1995. Therefore, we presume that this change in the family code was not intended to be substantive, and thus section 102.004(b) still allows intervention in suits brought under the general standing provision codified in section 102.003. *See Jones*, 969 S.W.2d 431–32. Given that Spurck's proposed interpretation of 102.004(b) is inconsistent with the legislature's intent, we find that the trial court did not abuse its discretion in allowing L.G.'s foster parents to intervene in a suit brought by the Department. We overrule Spurck's second issue on appeal.

---

[7] Former section 11.03(c), which is now section 102.004(b), allowed intervention in suits brought under section 11.03(a), which is now section 102.003, the general standing provision. *See* Act of May 23, 1987, 70th Leg., R.S., ch. 744, § 1, 1987 Tex. Gen. Laws 2666 (amended 1989) (current version at Tex. Fam. Code Ann. §§ 102.003–.004).

19

**Jury instruction on preference for family placement**

In her third issue on appeal, Spurck asserts that the trial court erred in failing to instruct the jury that should her parental rights be terminated, Spurck's grandmother should be the preferred managing conservator of L.G. Specifically, Spurck asserts that there is an overarching policy preference for placing children with relatives, and thus the court should have instructed the jury that Spurck's grandmother was a preferable managing conservator. A jury instruction is proper when it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and the evidence. *See In re D.O.*, 338 S.W.3d 29, 38 (Tex. App.—Eastland 2011, no pet.). We review a trial court's decision to submit or refuse to submit a particular jury instruction for an abuse of discretion. *See In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).

At trial, Spurck proposed the following jury instruction, which the trial court refused to give:

> [Spurck's grandmother] shall be appointed as sole or joint managing conservator in preference to the Department or [L.G.'s foster parents] unless you find from a preponderance of the evidence that it would not be in the best interest of the child to appoint [Spurck's grandmother].

On appeal, Spurck claims that the jury instruction was warranted because there is an overall policy preference that children should be placed with family members. Spurck asserts that this policy preference is repeatedly expressed in the family code. *See* Tex. Fam. Code Ann. §§ 262.114(c)(1) (noting that Department should place child with foster parent if placement with relative not in best interest), 263.306(a)(6) (requiring Department to identify relatives who could provide safe

20

environment at every permanency hearing), 263.404(a)(2) (noting court may appoint Department managing conservator without terminating parent's rights if placement with relative not in child's best interest) (West Supp. 2012).

However, the sections of the family code upon which Spurck relies are not applicable in this case. The issue of managing conservatorship of L.G. arose from the termination of Spurck's parental rights. By their own terms, the statutes that Spurck relies upon create a statutory preference for placement with a relative while a parent still retains her parental rights. *See id.* §§ 262.114(c)(1), 263.306(a)(6), 263.404(a)(2); *see also In re D.O.*, 338 S.W.3d at 38–39 (noting that section 263.404 does not create preference for granting managing conservatorship to relative when parental rights have been terminated).

Given that the Department sought to terminate Spurck's parental rights, appointment of a managing conservator for L.G. was governed by section 161.207. This section provides that if a court terminates the parent-child relationship of both parents, "the court shall appoint a suitable, competent adult, [the Department], a licensed child-placing agency, or an authorized agency as managing conservator of the child." *See* Tex. Fam. Code. Ann. § 161.207(a) (West 2008). Unlike the sections cited by Spurck, this section does indicate that a relative should be given preference as a managing conservator once the parents' rights have been terminated. *See id.*; *see also In re D.O.*, 338 S.W.3d at 38–39. Thus, Spurck's proposed jury instruction misstates the law, and the trial court did not abuse its discretion in refusing to submit it to the jury. *See V.L.K.*, 24 S.W.3d at 341. We overrule Spurck's third issue on appeal.

21

**Sufficiency of the evidence**

In her fourth and fifth issues on appeal, Spurck claims that the evidence is legally and factually insufficient to support the jury's finding that a statutory ground for termination exists and that termination is in L.G.'s best interest.[8] To terminate the parent-child relationship, the factfinder must find clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). We will review the sufficiency of the evidence to support these two findings separately.

*Standard of review*

"The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In a termination case, we review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the factfinder's determination and will uphold a finding if a reasonable factfinder could have formed a firm conviction that its finding was true. *Id.* To give appropriate deference to the factfinder's conclusions, we must assume that the jury resolved disputed facts in favor of its finding if it could reasonably do so. *Id.* An appellate court should disregard evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

---

[8] Spurck preserved her challenges to the sufficiency of the evidence by timely filing a motion for new trial which included a statement of points on appeal. *See* Act of June 15, 2001, 77th Leg., R.S., ch. 1090, 2001 Tex. Gen. Laws 2397 (amended 2011) (current version at Tex. Fam. Code Ann. § 263.405(b) (West Supp. 2012)) (establishing requirements for preservation of issues on appeal from final order). Subsequent to the proceedings in this case, the family code was amended to remove this procedural requirement. *See* Tex. Fam. Code Ann. § 263.405(b).

When reviewing the factual sufficiency of the evidence in a parental termination case, we view all of the evidence in a neutral light and determine whether a reasonable factfinder could form a firm belief or conviction that a given finding was true. *In re C.H.*, 89 S.W.3d at 18–19. We assume that the jury resolved disputed facts in favor of its finding if a reasonable jury could do so, and we disregard evidence that a reasonable jury could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if that disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

*Statutory ground for termination*

At trial, the jury was asked whether Spurck's parental rights should be terminated pursuant to subsections (D) and (E) of section 161.001(1) of the family code. Under subsection (D), a jury must find by clear and convincing evidence that Spurck "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D). By contrast, subsection (E) requires a jury to find by clear and convincing evidence that Spurck "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See id.* § 161.001(1)(E). The jury, after being instructed that termination required clear and convincing evidence of at least one of these grounds, found that Spurck's parental rights should be terminated.

Only one statutory ground is necessary to support a judgment in a parental-rights-termination case. *See In re A.V.*, 112 S.W.3d 355, 362 (Tex. 2003). Therefore, when multiple

23

statutory grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if any of the statutory grounds alleged supports it. *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet denied).

Both subsections (D) and (E) require proof of child endangerment, i.e., exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment does not need to be established as an independent proposition, but may be inferred from parental misconduct alone. *Id.* Subsection (D) requires proof that the environment in which the parent placed the child endangered the child's physical or emotional well-being, while subsection (E) requires proof that the cause of the endangerment was the parent's actions or failure to act. *Id.*

In this case, Spurck admitted to Ranger Ramos, her counselor, and to the jury that she continued to allow her children to live with Garza while Garza was physically assaulting her. Spurck acknowledged that on at least one occasion, Garza assaulted her in front of L.G. Furthermore, Spurck knew that Garza had been accused of injury to a child in the past. In addition, Spurck suspected that Garza was responsible for an injury to I.G.'s head, but she did not seek emergency medical treatment for fear of implicating Garza. Finally, even though Spurck denied knowing that Garza was actually charged with injury to a child, Sergeant Boswell testified that he told Spurck that Garza had been arrested for injury to a child, and that she "needed to reevaluate her relationship with Mr. Garza" based on his criminal history and arrest for injury to a child.

Considering the evidence in the light most favorable to the jury's finding, we find that a jury could reasonably have formed a firm conviction that Spurck knowingly placed L.G. in an

24

environment which endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Therefore, we conclude that the evidence is legally sufficient to support the jury's finding that one of the statutory grounds for termination exists. *See In re A.V.*, 112 S.W.3d at 362. Similarly, considering the evidence in a neutral light, we determine that a jury could reasonably have formed a firm belief or conviction that Spurck knowingly placed L.G. in conditions that endangered his physical or emotional well-being. Therefore, we conclude that the evidence is factually sufficient to support the jury's finding that one of the statutory grounds for termination exists. *See J.F.C.*, 96 S.W.3d at 266. Having determined that the evidence is sufficient to support the jury's finding on one of the statutory grounds, we need not consider whether the evidence would support other grounds for termination. *See In re B.K.D.*, 131 S.W.3d at 16. We overrule Spurck's fourth issue on appeal.

*Child's best interest*

In a parental-rights-termination case, the best interest of the child is assessed using a non-exhaustive list of factors. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). These factors include (1) the child's wishes, (2) his emotional and physical needs now and in the future, (3) emotional or physical danger to the children now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the acts or omissions of the parent which indicate that the existing parent-child relationship is not proper, and (9) any excuses for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

25

The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

In this case, we recognize that the hardships in Spurck's life are not wholly of her own making. There was evidence that she was abused as a child. Furthermore, we cannot ignore the fact that Spurck began dating Garza when she was only sixteen years old, and that she did not have long-term plans to remain with him prior to becoming pregnant with L.G. We also acknowledge that Spurck expressed a desire to turn her life around, and that she substantially completed all of the requirements of her family service plan. We do not doubt that Spurck loves L.G. However, in considering the best interests of the child, "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *See Smith v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.).

Many witnesses testified on behalf of the various parties about who was best suited to assume custody of L.G. While we do not recite all of the testimony here, we note that the jury heard evidence that (1) Spurck allowed her children to live with Garza even though Garza repeatedly physically abused her, (2) Spurck had reason to suspect that Garza had previously injured a child, (3) when Spurck realized that I.G. was injured, she delayed seeking medical treatment for fear that

26

Garza might get in trouble, and (4) she initially refused to cooperate with law enforcement in the investigation of I.G.'s death. The jury could reasonably have found that these past acts and omissions were inexcusable and indicated that Spurck's relationship with L.G. was not stable or safe. *See Holley*, 544 S.W.2d at 372; *Smith*, 160 S.W.3d at 681. Furthermore, the jury could reasonably have inferred that Spurck's failure to protect L.G. from emotional and physical danger in the past may indicate that she would fail to do so in the future. *See In re C.H.*, 89 S.W.3d at 28 (noting that past endangerment may be probative of child's best interests now and in future); *Holley*, 544 S.W.2d at 371–72 (noting that courts may consider evidence relating to current and future emotional and physical needs of child).

In addition, the Department introduced evidence that Spurck continued to be deficient in her parenting abilities. Although Spurck participated in all of the recommended parenting programs, testimony indicated that she failed to apply the lessons from her parenting classes during her supervised visitations with L.G. In addition, Spurck's counselor testified that she was concerned that Spurck was being disingenuous during their sessions, indicating that she did not fully take advantage of the programs the Department offered to help her become a better parent. Based on this evidence, the jury could reasonably have inferred that Spurck had relatively limited parenting skills and would not fully participate in programs designed to improve her abilities in the future. *See In re K.B.*, No. 03-09-00366-CV, 2010 WL 5019368, at *8 (Tex. App.—Austin Dec. 9, 2010, no pet.) (mem. op.) (noting that parent's participation in parenting programs may be discounted if has not resulted in lasting improvements in parenting skills). By contrast, the jury heard testimony that L.G.'s foster parents were excellent parents who provided a safe and stable home for L.G.

27

Therefore, the jury could have reasonably found that the relative parenting abilities of the parties seeking custody indicated that terminating Spurck's parental rights was in L.G.'s best interest. *Holley*, 544 S.W.2d 371–72. Similarly, the jury could have reasonably found that Spurck would not avail herself of programs designed to help her provide a better environment for L.G. *Id.*

Finally, the jury heard evidence that Spurck could not provide a home for herself and L.G. on her own. At the time of trial, Spurck was living with her mother, and her job did not pay enough for her to be self-sufficient. Spurck stated that if she was awarded custody of L.G., she would try to move in with either her grandmother or the Medina Home—a "home where victims of domestic violence go with their children." However, there was no testimony that either Spurck's grandmother or Medina Home had agreed to support Spurck, and thus the jury could have reasonably inferred that Spurck could not provide a stable home. In addition, the jury heard some evidence that L.G. had bonded to his foster parents, that he referred to them as mom and dad, and that he considered their home to be his home. *See In re J.L.C.*, 194 S.W.3d 667, 675 (Tex. App.—Fort Worth 2006, no pet.) (noting that toddler's affection and attachment to foster parents can be evidence of child's desire to remain with foster family).

Considering this evidence in the light most favorable to the jury's finding, we find that a jury could reasonably have formed a firm belief that termination of Spurck's parental rights was in L.G.'s best interest. Therefore, we conclude that the evidence is legally sufficient to terminate L.G.'s parental rights. Similarly, in considering the evidence in a neutral light, we determine that a jury could reasonably have formed a firm belief or conviction that termination of Spurck's parental rights was in L.G.'s best interest. Therefore, we conclude that the evidence is also factually sufficient to support the jury's finding. We overrule Spurck's fifth and final issue on appeal.

28

## CONCLUSION

Having overruled Spurck's five issues on appeal, we affirm the judgment of the trial court.

_____

Scott K. Field, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed:   February 8, 2013